LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fax: (702) 382-1169

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| In re: | Case No. 20-12865-abl |
|---|---|
| | Chapter 11 |
| VITALIBIS, INC., | |
| | Confirmation Hearing: |
| Debtor. | Date:  January 13, 2021 |
| | Time:  1:30 p.m. |

## DISCLOSURE STATEMENT TO ACCOMPANY
## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

PARTIES SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE OFFER, ISSUANCE, AND DISTRIBUTION OF THE NEW EQUITY INTERESTS ISSUED IN EXCHANGE FOR CLAIMS AS SET FORTH IN THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AND ALL RULES AND REGULATIONS PROMULGATED THEREUNDER, AND ANY STATE OR LOCAL LAW REQUIRING REGISTRATION FOR THE OFFER, ISSUANCE, OR DISTRIBUTION OF SECURITIES.  THESE SECURITIES SHALL BE FREELY TRADABLE BY THE RECIPIENTS THEREOF, SUBJECT TO: (I) THE HOLDER NOT BEING AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN "AFFILIATE" OF THE REORGANIZED DEBTOR THAT ISSUED SUCH SECURITIES; (II) COMPLIANCE WITH ANY RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION APPLICABLE AT THE TIME OF ANY FUTURE TRANSFER OF SUCH SECURITIES OR INSTRUMENTS; (III) ANY RESTRICTIONS ON THE TRANSFERABILITY OF THE NEW EQUITY INTERESTS CONTAINED IN THE NEW BYLAWS FOR REORGANIZED DEBTOR; AND (IV) APPLICABLE REGULATORY APPROVAL.

THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE CLAIMS IS BEING MADE PURSUANT TO SECTION 4(A)(2) AND REGULATION D OF THE SECURITIES ACT AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE ELIGIBLE HOLDERS (*I.E.*, ACCREDITED INVESTORS AS DEFINED IN RULE 501 OF THE SECURITIES ACT); *PROVIDED*, *HOWEVER*, THAT ALL HOLDERS OF ALLOWED CLAIMS WILL BE ENTITLED TO RECEIVE DISTRIBUTIONS UNDER THE PLAN.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE NEW EQUITY INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE

STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS AND VARIATIONS OF SUCH WORDS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.   FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING THE IMPLEMENTATION OF THE PLAN.   IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTOR'S CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.   ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.   THE DEBTOR AND REORGANIZED DEBTOR, AS APPLICABLE, DO NOT INTEND OR UNDERTAKE ANY   OBLIGATION   TO   UPDATE   OR   OTHERWISE   REVISE   ANY FORWARDLOOKING   STATEMENTS,   INCLUDING   ANY   PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS OR FINANCIAL PROJECTIONS HEREIN.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

THE DEBTOR HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.

ALL PARTIES ENTITLED TO VOTE ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

PLEASE BE ADVISED THAT SECTIONS 10.3, 10.4, 10.5, AND 10.6 OF THE PLAN CONTAIN DISCHARGE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................1

II.   INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT.........1

III.  OVERVIEW OF THE DEBTOR'S BUSINESS AND ITS CHAPTER 11 CASE............2
      A.    History and Formation. ..................................................................2
      B.    Business Operations...................................................................2
      C.    Directors and Executive Officers...................................................3
            1.    Steven Raack...............................................................3
            2.    Thomas Raack..............................................................4
      D.    Advisory Committee...................................................................4
      E.    Indebtedness.............................................................................6
      F.    Events Leading to the Commencement of the Chapter 11 Case............9
      G.    Initial Proceedings in the Chapter 11 Case. ..................................9

IV.   SUMMARY OF THE PLAN ..................................................................9
      A.    General Overview. .....................................................................9
      B.    Restructuring Transactions. .......................................................10
      C.    New Value Contribution and Management Incentive Plan. ...................10
      D.    Treatment of Administrative Claims. ...........................................11
      E.    Priority Tax Claims....................................................................11
      F.    Treatment of Classified Claims. .................................................11
            1.    Class 1:  The SBA Secured Claim ...................................11
            2.    Class 2:  Other Secured Claims ......................................12
            3.    Class 3:  Priority Non-Tax Claims....................................12
            4.    Class 4:  Noteholder Claims ...........................................13
            5.    Class 5:  General Unsecured Trade Claims .........................13
            6.    Class 6:  Existing Equity Interests ...................................13
            7.    Class 7:  Subordinated Securities Claims ...........................13
      G.    Treatment of Executory Contracts and Unexpired Leases. .................14
      H.    Conditions Precedent to the Occurrence of the Effective Date .............14
            1.    Conditions Precedent to Effective Date...............................14
            2.    Waiver of Conditions Precedent ......................................14
            3.    Effect of Failure of a Condition .......................................14
      I.    Effect of Confirmation of the Plan................................................14
            1.    Binding Effect.............................................................14
            2.    Vesting of Assets ........................................................15
            3.    Discharge of Claims against and Interests in Debtor...............15
            4.    Injunction against Interference with Plan ...........................15
            5.    Plan Injunction ...........................................................15
            6.    Exculpation. ...............................................................16
            7.    Preservation of Causes of Action......................................17

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

iv

V.    ALTERNATIVES TO THE DEBTOR'S PLAN ..............................................17

VI.   TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
      SECURITIES LAWS..........................................................................................18

VII.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..........20
      A.    Introduction...........................................................................................20
      B.    Consequences to the Debtor...................................................................20
      C.    Consequences to Noteholders ...............................................................22

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ....................................................22

IX.   VOTING PROCEDURES AND REQUIREMENTS.........................................................27
      A.    Voting Instructions and Voting Deadline ..............................................27
      B.    Voting Procedures..................................................................................27
      C.    Parties Entitled to Vote .........................................................................28
            1.    Voting Creditors.............................................................................28
            2.    Non-Voting Parties ........................................................................29
            3.    Miscellaneous ................................................................................29
            4.    Fiduciaries and Other Representatives............................................29
            5.    Agreements upon Furnishing Ballots.............................................30
      D.    Waivers of Defects, Irregularities, etc. ................................................30
      E.    Further Information, Additional Copies ................................................30

X.    CONFIRMATION OF THE PLAN.............................................................................30
      A.    Confirmation of the Plan.......................................................................30
      B.    Objections to Confirmation of the Plan.................................................30
      C.    Requirement for Confirmation of Plan ..................................................31
            1.    Requirements of Section 1129(a) of the Bankruptcy Code .....................31
            2.    Additional Requirements for Non-Consensual Confirmation ..................34

XI.   RECOMMENDATION AND CONCLUSION................................................................35

**APPENDIX**

Exhibit 1 - Plan of Reorganization

Exhibit 2 - Liquidation Analysis

Exhibit 3 - Financial Statements

Exhibit 4 - Pro Forma Projections

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

## I.  INTRODUCTION

On June 15, 2020 (the "Petition Date"), Vitalibis, Inc., a Nevada corporation (the "Debtor") filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada, Las Vegas (the "Bankruptcy Court"), thereby commencing case number BK-S-20-12865-abl (the "Chapter 11 Case").   The Debtor has prepared this Disclosure Statement (the "Disclosure Statement")[1] in connection with the solicitation of votes on its *Plan of Reorganization* (the "Plan") to treat the Claims of Creditors and Equity Securities of the Debtor.  The various exhibits to this Disclosure Statement included in the Appendix are incorporated into and are a part of this Disclosure Statement.  The Plan is attached hereto as **Exhibit 1.**  After having reviewed the Disclosure Statement and the Plan, any interested party desiring further information may contact:

LARSON & ZIRZOW, LLC
Attn: Matthew C. Zirzow, Esq.
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 Telephone
(702) 382-1169 Facsimile
Email: mzirzow@lzlawnv.com

Interested parties may also obtain further information from the Bankruptcy Court at its PACER website: http://www.nvb.uscourts.gov (PACER account required), or from the Clerk of Court, the United States Bankruptcy Court for the District of Nevada, Foley Federal Building and U.S. Courthouse, 300 Las Vegas Boulevard South, Las Vegas, Nevada 89101.

## II.  INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT

The objective of a chapter 11 case is the confirmation (*i.e.*, approval by the bankruptcy court) of a plan of reorganization for a debtor.  A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against a debtor.  After a plan has been filed, the holders of such claims that are impaired (as defined in section 1124 of the Bankruptcy Code) are permitted to vote to accept or reject the plan.  Before a debtor or other plan proponent can solicit acceptances of a plan, section 1125 of the Bankruptcy Code requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about Debtor and the Plan to enable Creditors to make an informed decision in exercising their rights to accept or reject the Plan.  After the appropriate Persons have voted on whether to accept or reject the Plan, there will be a hearing on the Plan to determine whether it should be confirmed.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including but not necessary limited to section 1129 of the

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.

1

Bankruptcy Code.  The Bankruptcy Court will also receive and consider a ballot summary that will present a tally of the votes of Classes accepting or rejecting the Plan cast by those entitled to vote.  Once confirmed, the Plan will be treated essentially as a contract binding on all Creditors and other parties-in-interest in the Chapter 11 Case.

**THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  FOR THE CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.**

Unless otherwise specifically noted, the financial information in this Disclosure Statement has not been subject to audit.  Instead, this Disclosure Statement was prepared from information compiled from records maintained in the ordinary course of Debtor's business.  The Debtor has attempted to be accurate in the preparation of this Disclosure Statement.  Other than as stated in this Disclosure Statement, the Debtor has not authorized any representations or assurances concerning its operations or the value of his assets.  Therefore, you should scrutinize any information received from any third-party and you assume any risk resulting from reliance upon such unauthorized information.  In deciding whether to accept or reject the Plan, you should therefore not rely on any information relating to the Debtor or the Plan other than that contained in this Disclosure Statement or in the Plan itself.

## III.    OVERVIEW OF THE DEBTOR'S BUSINESS AND ITS CHAPTER 11 CASE

### A.    History and Formation.

The Debtor was formed on April 11, 2014 as a Nevada corporation under the name of Crowd 4 Seeds, Inc.  The Debtor focuses on the development, sale and distribution of hemp oil-based products that contain naturally occurring cannabinoids, including cannabidiol ("CBD") and other products containing hemp oil ("Legal Hemp").  The Debtor leverages its proprietary technology platform to maximize its innovative micro-influencer sales model, which fosters engaged customer connections.

On January 18, 2018, the Debtor's Board of Directors approved an agreement and plan of merger to merge with and into its wholly-owned subsidiary, Vitalibis, Inc., a Nevada corporation, and its name changed from Sheng Ying Entertainment Corp. to Vitalibis, Inc. Vitalibis, Inc. was formed solely to effect the change of name and conducted no operations.

### B.    Business Operations.

The Debtor markets and sells consumer products containing full spectrum hemp oil with naturally occurring CBD under its Vitalibis® brand in a range of market sectors including wellness, and personal care.  The Debtor currently distributes seven (7) Vitalibis® branded products and it expects to continue to add new products.  The company also expects to develop and launch new brands under the Vitalibis® product development umbrella to more effectively market and sell certain products.  The Debtor also sells water soluble full spectrum hemp powder with naturally occurring CBD acquired through its supply relationships in the United States to various customers that produce products for resale into the market.  The company also has begun offering non-exclusive licenses of its proprietary Vitalibis® technology back-end, which is being

2

offered as a Software as a Service (SaaS) platform.

The Debtor's inventory is manufactured at third party facilities. Inventories are stated at the lower of cost or net realizable value, using the first-in, first-out method. The Company reviews its inventory for obsolescence and any inventory identified as obsolete is reserved or written off. The Debtor's determination of obsolescence is based on assumptions about the demand for its products, product expiration dates, estimated future sales, and management's future plans.

The company has filed trademark applications on its brands, logos and marks including, but not limited to Vitalibis®.

The Debtor has built a proprietary technology platform utilizing highly scalable peer-to-peer sales technology. The technology includes: Administrative back-end module Customer Data Management Reporting and Metrics, along with Customer Support Management. The company also intends to develop payment processing, engagement campaigns (using patent-pending VOTOCAST® technology) mobile application tools, artificial intelligence and machine learning. The company intends to explore patents related to this technology in the future.

A copy of the Debtor's financial statements for December 31, 2019 and 2018, and as previously attached to its most recent Form 10-K annual report for 2019 filed with the Securities Exchange Commission on March 13, 2020, as well as its financial statements through September 30, 2020 attached to its most recent Form 10Q for Q3 2020 as filed with the SEC on November 17, 2020, are attached as **Exhibit 3**. The Debtor is a publicly reporting company with the United States Securities Exchange Commission, stock symbol VCBD. The Debtor suffered recurring losses and generated negative cash flows from operations since inception. Due to these conditions, it raised substantial doubt about its ability to continue as a going concern. The Debtor's sole officers and directors are Steve and Tom Raack, who are also brothers.

## C. Directors and Executive Officers.

### 1. Steven Raack.

Steven P. Raack is a Director, President, and Chief Executive Officer of the Debtor. He has over 25 years of strategy, operations, technology, product development and business management experience. He has worked for industry leading companies, from global corporations to start-ups, including NASA, Andersen Consulting, Electronic Data Systems, Sony Pictures Entertainment, Herbalife International, Arbonne International, Beautycounter and VOTOCAST.

In 2012, Mr. Raack joined Beautycounter as their Chief Operating Officer, and helped launch a progressive brand focused on selling safe skin care, body care and cosmetics products. He was integral in developing the strategies and execution programs related to their innovative eCommerce, social selling and affiliate marketing business model, which attracted top-tier investors such as TPG Growth.

After 3½ years with Beautycounter, in 2016, Mr. Raack left to become the Chief Executive Officer of VOTOCAST – a patent-pending customer engagement SaaS platform. The

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

3

VOTOCAST technology platform was strategically designed to maximize social media activities for sports teams, musicians, radio stations, consumer brands and social selling companies. Mr. Raack is currently the Chief Executive Officer of VOTOCAST. Mr. Raack commenced his business relationship with the Company in 2017, serving as the CEO, President and as a Director, and currently holds such positions. There is no arrangement or understanding between him and any other person(s) (including Thomas Raack) pursuant to which he was or is to be selected as a director or nominee.

In addition to serving as a Director and officer of the Company, Mr. Raack, as time permits, also currently assists several start-up and growth companies as an Executive Advisor. Mr. Raack earned a B.S. in Electrical Engineering from the University of Southern California and an MBA from Pepperdine University.

### 2.    Thomas Raack.

Thomas Raack is a Director, Secretary, Chief Financial Officer and Treasurer of the Debtor. He has over 20 years of financial, executive and strategic management experience with a diverse group of private and publicly-held companies specializing in the development of technology, medical product distribution, biotechnology, and e-commerce. Mr. Raack has a broad base of business consulting experience and has assisted in structuring and completing, acquisitions, debt and equity financing, reorganizations, as well as designing and implementing business development and financial communications programs.

From 1998 to 2002, Mr. Raack was a managing partner at Alliance Capital Resources, with offices in Newport Beach, CA. While at Alliance, Mr. Raack consulted for publicly-traded companies handling domestic mergers and acquisitions, venture capital transactions, public offerings and other financings, joint ventures, strategic alliances and distribution agreements. His experience at Alliance also included managing financial communications for a NASDAQ-listed medical products distribution company.

From 2002 to 2017, Mr. Raack was an independent consultant with a focus on assisting private companies with business development and operational systems. Mr. Raack commenced his business relationship with the Company in 2017, serving as Secretary, Treasurer, Chief Financial Officer and as a Director, and currently holds such positions.

### D.    Advisory Committee.

The Company has established an Advisory Board to provide the Company's Board of Directors with fresh perspectives on (a) strategy, economic trends, or specific geographic markets and regulatory regimes, and (b) vision, innovation, risk management, and profitability. Although they are intended to provide management with advice, they do not possess the authority to vote on corporate matters. Advisor compensation will be determined by the Directors on a case-by-case basis, depending on a variety of factors, and may consist of cash, equity in the Company, or a blend thereof. The Debtor's Advisory Board currently consisting of the following Advisors:

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

### 1. Dusty Baker

Mr. Baker was drafted by the Atlanta Braves in the 1967 amateur draft out of Del Campo High School near Sacramento, California.  He began his major league baseball career as an outfielder for the Braves in 1968.  As a Brave, he earned a spot as a footnote in history. On April 8, 1974, he was on deck when Hank Aaron hit home run 715 to pass Babe Ruth in career home runs. Baker also played for the Los Angeles Dodgers, the San Francisco Giants and the Oakland Athletics.

Mr. Baker's coaching career started as a first base coach for the San Francisco Giants in 1988, and then he spent the following four years (1989-1992) as the hitting coach, and finally became the manager in 1993.  Mr. Baker has also held Manager positions with the Chicago Cubs, Cincinnati Reds and the Washington Capitals.

Mr. Baker enjoyed many accolades throughout his career: 2x All Star (1981, 1982), World Series champion (1981), NLCS MVP (1977), Gold Glove (1981) and 3x NL Manager of the Year (1993, 1997, 2000). Additionally, Mr. Baker is an accomplished businessman, owning Baker Family Wines and Baker Energy Team which services the cannabis cultivation industry.

As an Advisor, Mr. Baker works with the Vitalibis management team on various company strategies and priorities.  As a Founding Ambassador, Mr. Baker will help educate and provide awareness of the Vitalibis products, social mission and technology.  These efforts will focus on driving sales and additional collaborations with other Ambassadors to assist in growing the Vitalibis brand.

### 2. Dr. Steven Zodkoy

Dr. Zodkoy is a board-certified chiropractor, nutritionist, kinesiologist and industry thought-leader who, for over twenty years, has specialized in treating patients who have been deemed "untreatable" through a standard course of treatment.  Dr. Zodkoy attended Rutgers University and received his bachelor's degree and Doctor of Chiropractic degree from Los Angeles College of Chiropractic at the age of twenty-four.

Dr. Zodkoy is the author of the Amazon best-seller *Misdiagnosed: The Adrenal Fatigue Link*, which examines how adrenal fatigue has been linked to many health conditions and the best methods to diagnose and treat these conditions.

Dr. Zodkoy currently operates a practice in Freehold, New Jersey, where he regularly lectures to groups in his community and holds continuing education courses for medical professionals.

### 3. Dave Harper

Mr. Harper is considered an authority in the fields of branding, multiplatform content strategy, premium hospitality and beverages. His cross functionality makes him a highly sought-after advisor to CEOs, senior level executives, and investors.  Mr.  Harper is currently the President of Daily Botanic, an expertly formulated hemp tonic brand focused on hydration and balanced wellbeing.  He is also a Partner in the hugely successful restaurant, The Waterfront

Venice, in Venice, California.    Additionally, he is a Principal with Bower Hospitality and the owner of Bondi Harvest Café.  Mr. Harper has more than 14 years of successful, hands-on brand and business development experience.

### 4.  Dave Wentz

Mr. Wentz helped found publicly traded USANA Health Sciences, Inc. in 1992, and was instrumental in leading it to $1 billion in sales while serving over 1/2 million families. At USANA, Dave played many roles, including: VP of Strategic Development, Executive Vice President, President and CEO. USANA Health Sciences, Inc. develops and manufactures nutritional, personal care and weight-management products.

### 5.  Oran Arazi-Gamliel

With over 20 years in general management and C-suite positions in the global wellness and direct selling arenas, Mr. Arazi-Gamliel has operated in the North America, Australia, Japan, UK, Russia and Israel markets.  During his tenure, Mr. Arazi-Gamliel was responsible for building from scratch, as well as restructuring, numerous direct selling operations. In his latest executive position, he served as Chief Global Officer and Head of M&A of Rodan + Fields, a prestige dermatology-inspired skincare brand that grew to over $1.5B in 2017 and became the number 1 skin-care brand in North America.   In this position, Mr. Arazi-Gamliel was instrumental in creating key field behavioral programs and the global market entry strategies.

### 6.  Stacy Brovitz

Mr. Brovitz started his career at JP Morgan Chase where he was one of the leaders in the development of the bank's asset securitization business in the late 1980's.  Mr. Brovitz served as Chief Operating Officer for Dormont Manufacturing Company, the leading manufacturer of stainless-steel gas appliance connectors, for 16 years where he successfully managed the company through a period of rapid growth and eventual sale to a strategic buyer.  He then served as SVP Global Operations for Herbalife Nutrition where he led the development of the company's manufacturing and supply chain strategic plan.  Mr. Brovitz then served as CEO of Bacharach, Inc., a manufacturer of gas leak detection instruments, where he managed the successful turnaround of the company.  Most recently, he has been an investor in and advisor to several startups, an active trader in the capital markets and serves on the boards of several charities.

### E.    Indebtedness.

The Debtor entered into a series of unsecured convertible debentures, which as of the filing of this Plan, total approximately $1,200,000.00 in principal amount, prior to any interest and costs, although this amount changes overtime given ongoing conversions.  The Debtor also has other general unsecured trade debt incurred in the ordinary course of business consisting of less than five (5) claims and less than $30,000 in claims.

On March 29, 2019, the Company entered into an unsecured convertible promissory note which allowed for up to $750,000 of principal, with a total original issue discount of up to $150,000, with a principal amount of $250,000. In April 2019, the Company received net cash

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

proceeds of $200,000 after an original issue discount of $50,000. In July 2019, the Company received additional proceeds of $200,000 after an original issue discount of $50,000, and received an additional $200,000 of net proceeds after $50,000 original issue discount in August 2019. The convertible note bears interest at 8% and all principal amounts matured on September 30, 2019, with interest accruing at a rate of 22% if the Company is in default. Beginning at the issuance of the note, the holder may convert the note at any time through the maturity date into shares of common stock, to the extent and provided that no holder of these notes was or will be permitted to convert such notes to the extent that the holder or any of its affiliates would beneficially own in excess of 4.99% of the Company's common stock after such conversion. The conversion price is the lesser of $2 or 70% of the lowest trading price during the 30 trading days prior to the conversion date. During the year ended December 31, 2019, the lender converted $50,000 of principal into 714,296 shares of common stock in accordance with the terms of the agreement. During the three months ended March 31, 2020, the lender converted $68,000 of principal into 1,922,581 shares of common stock. The conversions were in accordance with the terms of the note and no gain or loss was recognized.

On March 13, 2020, the lender provided the Company with notice of default of the convertible promissory note. In accordance with the terms of the agreement, an additional $316,000 of principal became due and payable, and the Company began accruing interest expense at the default rate of 22%. The additional principal was recorded as debt discount and amortized to interest expense immediately. As of March 31, 2020, there is $948,000 of principal outstanding on this convertible promissory note in default.

On September 6, 2019, the Company entered into an unsecured convertible promissory note, with a principal amount of $153,000. The Company received net cash proceeds of $150,000 after payment of fees of $3,000. The convertible note bears interest at 10% and matures on September 6, 2021, with interest accruing at a rate of 22% if the Company is in default. Beginning six months after the issuance of the note, the holder may convert the note at any time through the maturity date into shares of common stock, to the extent and provided that no holder of these notes was or will be permitted to convert such notes to the extent that the holder or any of its affiliates would beneficially own in excess of 4.99% of the Company's common stock after such conversion. The conversion price is determined based on 65% of the lowest trading price during the 15 trading days prior to the conversion date. The Company determined that the conversion features should be accounted for as a derivative liability at the time of issuance of the notes. Unamortized discount and deferred financing costs were $115,800 as of March 31, 2020 related to this convertible note. During the three months ended March 31, 2020, the holder converted $29,000 of principal into 942,308 shares of common stock. These conversions were in accordance with the terms of the note and no gain or loss was recognized. There is $124,000 of principal remaining on this convertible note after these conversions.

On November 25, 2019, the Company entered into an unsecured convertible promissory note, with a principal amount of $78,000. The Company received net cash proceeds of $75,000 after payment of fees of $3,000. The convertible note bears interest at 10% and matures on November 25, 2021, with interest accruing at a rate of 22% if the Company is in default. Beginning six months after the issuance of the note, the holder may convert the note at any time through the maturity date into shares of common stock, to the extent and provided that no holder of these notes was or will be permitted to convert such notes to the extent that the holder or any

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

7

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

of its affiliates would beneficially own in excess of 4.99% of the Company's common stock after such conversion. The conversion price is determined based on 65% of the lowest trading price during the 15 trading days prior to the conversion date. Unamortized discount and deferred financing costs were $2,479 as of March 31, 2020 related to this convertible note.

On April 29, 2020, the Company received a notice of default from the holder of the September 6, 2019 convertible note payable, the November 25, 2019 convertible note payable with $78,000 of principal and the February 7, 2020 convertible note payable, as a result of insufficient shares authorized to settle conversion of these notes payable. As a result of the default notice, each of these notes became due and payable immediately, interest is accrued at the default rate of 22%, and the principal balance outstanding at the time of default is doubled. The total debt outstanding on these notes after giving effect to the default is $463,000.

On November 25, 2019, the Company entered into an unsecured convertible promissory note, with a principal amount of $150,000.  The Company received net cash proceeds of $131,000 after an original issue discount of $15,000 and fees of $4,000. The convertible note bears interest at 5% and matures on November 25, 2020, with interest accruing at a rate of 15% if the Company is in default. The note is convertible upon issuance through the maturity date into shares of common stock at a fixed price of $1.00 per share to the extent and provided that no holder of these notes was or will be permitted to convert such notes to the extent that the holder or any of its affiliates would beneficially own in excess of 4.99% of the Company's common stock after such conversion.  Beginning six months after the issuance of the note, the holder may convert the note at any time, at a price based on the lower of the fixed price of $1.00 per share or 75% of the lowest trading price during the 15 trading days prior to the conversion date. Unamortized discount and deferred financing costs were $10,539 as of March 31, 2020 related to this convertible note.

On December 10, 2019, the Company entered into an unsecured convertible promissory note, with a principal amount of $110,000.  The Company received net cash proceeds of $97,000 after an original issue discount of $10,000 and fees of $3,000. The lender also received 35,000 shares of common stock as a deferred finance cost, with a fair value of $8,407. The convertible note bears interest at 10% and matures on December 10, 2020, with interest accruing at a rate of 24% if the Company is in default. Beginning six months after the issuance of the note, the holder may convert the note at any time through the maturity date into shares of common stock, to the extent and provided that no holder of these notes was or will be permitted to convert such notes to the extent that the holder or any of its affiliates would beneficially own in excess of 4.99% of the Company's common stock after such conversion.  The conversion price is determined based on the lessor of 1) $0.24, or 2) the lesser of 62% of the lowest trade price or the closing bid price during the 20 trading days prior to the conversion date. Unamortized discount and deferred financing costs were $14,856 as of March 31, 2020 related to this convertible note.

On February 7, 2020, the Company entered into an unsecured convertible promissory note, with a principal amount of $78,000. The Company received net cash proceeds of $75,000 after payment of fees of $3,000. The convertible note bears interest at 10% and matures on February 7, 2022, with interest accruing at a rate of 22% if the Company is in default. Beginning six months after the issuance of the note, the holder may convert the note at any time through the maturity date into shares of common stock, to the extent and provided that no holder of these

notes was or will be permitted to convert such notes to the extent that the holder or any of its affiliates would beneficially own in excess of 4.99% of the Company's common stock after such conversion. The conversion price is determined based on 65% of the lowest trading price during the 15 trading days prior to the conversion date.

*As previously noted, the total amounts owing to the Noteholders change over time with their continuing conversions to equity.*

## F.    Events Leading to the Commencement of the Chapter 11 Case.

One of the principal reasons the Debtor filed for chapter 11 bankruptcy was that one of its Noteholders threatened to file collection litigation and to seek the appointment of a receiver over the Debtor's operations in aid of collection, and in a forum other than the Debtor's state of incorporation.  As a result, in order to avoid the significant negative repercussions on the Debtor's operations that would result from such actions, and to avoid the time and expense of litigating in a foreign forum, and in order to bring about a full and open process to restructure its affairs for the benefit of the entire enterprise, and not simply one small subset of Noteholders and at the expense of all other creditors and parties in interest, the Debtor, after consultation with its legal advisors, elected to commence this voluntary bankruptcy filing in order to achieve a restructuring of the company's financial affairs and in order to maximize the available recoveries for all creditors.  Another contributing factor to the Debtor's filing for bankruptcy was its inability to generate positive cash flow from operations and thus sustain operations without further financing.

## G.    Initial Proceedings in the Chapter 11 Case.

On June 15, 2020, the Debtor filed its voluntary petition, and on June 26, 2020, filed its bankruptcy schedules and statement of financial affairs.  On July 23, 2020, the Debtor's 341 first meeting of creditors was held and concluded.  The Debtor has sought and obtained approval to retain and employ the following professionals in its Chapter 11 Case to date:  Larson & Zirzow, LLC as its general reorganization counsel; Michael Morrison as its special counsel; and Fresh Notion Group as its accountants.  No request was made for the appointment of a trustee or examiner, and no official committees were formed in the case.  The Debtor's exclusive period to file a proposed plan of reorganization expired on October 13, 2020.

## IV.    SUMMARY OF THE PLAN

### A.    General Overview.

The following is a general overview of the provisions of the Plan, and is qualified in its entirety by reference to the provisions of the Plan itself.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

9

The Plan's treatment of each Class of Claims is summarized in the following table:

| Class | Description | Treatment |
|-------|-------------|-----------|
| Class 1 | SBA Secured Claim | Impaired.  Solicitation required. |
| Class 2 | Other Secured Claims | Unimpaired.  No solicitation required. |
| Class 3 | Priority Non-Tax Claims | Unimpaired.  No solicitation required. |
| Class 4 | Noteholder Claims | |
| 4(a) | Triton Funds Claims | Impaired.  Solicitation required. |
| 4(b) | Platinum Point Capital Claims | Impaired.  Solicitation required. |
| 4(c) | Power Up Lending Claims | Impaired.  Solicitation required. |
| 4(d) | FirstFire Global Opportunities Claims | Impaired.  Solicitation required. |
| Class 5 | Unsecured Trade Claims | Impaired.  Solicitation required. |
| Class 6 | Equity Securities | Impaired.  No Solicitation required.  Deemed to Reject. |
| Class 7 | Subordinated Securities Claims | Impaired.  No Solicitation required.  Deemed to Reject. |

**B.      Restructuring Transactions.**

On or before the Effective Date, the Debtor or the Reorganized Debtor shall enter into any transactions and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions.  The Debtor or the Reorganized Debtor will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtor, to the extent agreed in accordance with the Plan, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.   The actions to implement the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents that consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the rejection, assumption, or assumption and assignment, as applicable, of executory contracts and unexpired leases; (d) all other actions that the applicable parties determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan in each case of clauses (a) through (c).

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**C.      New Value Contribution and Management Incentive Plan.**

The Debtor has obtained a commitment from Tangiers Capital, LLC, or its designee, to loan the Debtor the sum of $100,000 as of the Confirmation Hearing, and for which it will

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

immediately receive an Allowed Administrative Claim against the Estate, which Cash shall be used to fund the New Value Contribution. The New Value Contribution is the principal means through which the Allowed Noteholder Claims shall receive a distribution in this case. The Holders of Allowed Noteholder Claims will share in the New Value Contribution *pro rata*. As of the Effective Date of the Plan, the New Value Participant's Allowed Administrative Claim shall be exchanged for one hundred percent (100%) of the New Equity Interests of the Reorganized Debtor, subject to the Management Incentive Plan as described below.

After the Effective Date, and after the issuance of all of the Reorganized Debtor's New Equity Interests to the New Value Participant, the members of the Reorganized Debtor's Board of Directors shall receive, in the aggregate, 95.1% of the New Equity Interests from the New Value Participant in exchange for their agreement to continue managing and operating the Reorganized Debtor on a day-to-day basis, and as and for a Management Incentive Plan.

### D.    Treatment of Administrative Claims.

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims are not designated as a Class. The Holders of such unclassified Claims shall be paid in full under the Plan consistent with the requirements of section 1129(a)(9)(A) of the Bankruptcy Code and are not entitled to vote on the Plan. The amount of Administrative Claims incurred, but unpaid as of the Confirmation Hearing is estimated to be $50,000.00 to the Debtor's various professionals including general bankruptcy counsel, special counsel, and an accountant. The foregoing total amount is an estimate only.

Each Allowed Administrative Claim shall be paid by Reorganized Debtor (or otherwise satisfied in accordance with its terms) upon the latest of: (i) the Effective Date or as soon thereafter as is practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the fourteenth (14th) Business Day after such Claim is Allowed, or as soon thereafter as practicable; or (iv) such date as the Holder of such Claim and Reorganized Debtor shall agree upon.

### E.    Priority Tax Claims.

Each Allowed Priority Tax Claim, if any, will be paid in full by the Reorganized Debtor on the later of: (i) the fourteenth (14th) Business Day after the date on which an order allowing such Claim becomes a Final Order; or (ii) such other time as is agreed to by the holder of such Claim and the Debtor prior to the Effective Date or the Reorganized Debtor after the Effective Date. Holders of Priority Tax Claims are not entitled to vote on confirmation of the Plan.

### F.    Treatment of Classified Claims.

#### 1.    Class 1:  The SBA Secured Claim

Class 1 is comprised of the Allowed Secured Claim of the Small Business Administration, which includes an outstanding principal of $68,400.00 and as secured in substantially all of the Debtor's tangible and intangible personal property, including but not limited to inventory, equipment, instruments including promissory notes, chattel paper, documents, letter of credit rights, accounts, deposit accounts, commercial tort claims, and

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

general intangibles, including payment intangibles and software, as well as all accessions, attachments, accessories, parts, supplies and replacement to the foregoing, and all products proceedings and collections thereof, and all records and data relating thereto. Except to the extent that the Holder of a Class 1 Claim agrees to a less favorable treatment, the Secured Claim of the SBA shall be satisfied by equal monthly payments in the amount of $334.00 per month made by the first business day of each and every month starting on March 1, 2021 and continuing for each and every month thereafter until paid in full, with all other terms of the Loan Authorization and Agreement with the SBA remaining in place, including its interest rate of 3.75% per annum. The SBA shall further retain any and all Liens in and to its Collateral and its Claim to the extent provided in its pre-petition loan and security documents. The Debtor further retains the option to pre-pay the Secured Claim of the SBA in full without prepayment penalty at any time. Class 1 is Impaired. The Holder of Allowed Class 1 Claim is entitled to vote to accept or reject the Plan.

### 2.    Class 2:  Other Secured Claims

Class 2 consists of any Allowed Other Secured Claims. Except to the extent that a Creditor with an Allowed Other Secured Claim agrees to less favorable treatment, each holder of an Other Secured Claim shall be considered to be in its own separate subclass within Class 2 and each such subclass shall be deemed to be a separate Class for purposes of the Plan. Except to the extent that the holder of an Allowed Claim in Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in Class 2 shall be satisfied by, at the option of the Debtor: (i) payment in Cash by the Debtor in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled. In the event an Allowed Claim in Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court. Creditors in Class 2 are Unimpaired under the Plan. Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

### 3.    Class 3:  Priority Non-Tax Claims

Class 3 consists of all Priority Non-Tax Claims. Except to the extent that a Creditor with an Allowed Priority Non-Tax Claim agreed to less favorable treatment, each Allowed Priority Non-Tax Claim shall be paid in full by the Reorganized Debtor upon the latest of: (i) the first Business Day after the Effective Date; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the fourteenth (14th) Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the holder of such Claim and, prior to the Effective Date, Debtor, and after the Effective Date, the Reorganized Debtor, shall agree. Each Holder of a Priority Non-Tax Claim shall also receive on account of such Holder's Allowed Priority Non-Tax Claim payment of post-petition interest calculated at the Federal Judgment Rate unless there is an applicable contractual interest rate, in which case interest shall be paid at the contractual interest rate so long as (i) a contractual interest rate was set forth in a timely filed proof of claim or (ii) the Holder of such Claim provides written notice of such contractual interest rate to the

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Debtor's counsel on or before the Effective Date, and subject to the Debtor's and any other Person's right to verify or object to the existence of the asserted contractual rate of interest. Creditors in Class 3 are Unimpaired under the Plan.  Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

**4.     Class 4:  Noteholder Claims**

Class 4 consists of the Allowed Claims of the Noteholders against the Debtor.  Except to the extent that a Noteholder Claimant agrees to less favorable treatment, Holders of Class 4 Noteholder Claims will receive, in full and final satisfaction of their Allowed Claims, and immediately upon the occurrence of the Effective Date, their *pro rata* share of the New Value Contribution based on the amount of their Allowed Claim as of the Distribution Date.  Each Noteholder shall be its own separate subclass within Class 4.  Class 4 is Impaired under the Plan. Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

**5.     Class 5:  General Unsecured Trade Claims**

Class 5 consists of Allowed General Unsecured Trade Claims against the Debtor.  Except to the extent that the Holder of a Class 5 Claim agrees to less favorable treatment, Holders of Class 5 Allowed General Unsecured Claims shall receive, in full and final satisfaction of their Allowed Claims, payment of their *pro rata* share of the sum of $2,500.00 on July 1, 2021.  Class 5 is Impaired under the Plan.  Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

**6.     Class 6:  Existing Equity Interests**

Class 6 consists of the holders of Existing Equity Interests in the Debtor.  The Holders of Existing Equity Interests shall have their Interests cancelled, and shall receive no distribution. Class 6 is Impaired under the Plan.  Holders of Class 6 Existing Equity Interests shall be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

**7.     Class 7:  Subordinated Securities Claims**

Class 7 consists of the holders of a Claim that is subordinated, or subject to subordination, pursuant to Section 510(b) of the Bankruptcy Code, including, without limitation, a claim arising from the rescission or purchase of a sale or security of any Debtor or an affiliate of any Debtor, for damages arising from the purchase or sale of such security or for reimbursement, or for contribution on account of such Claim pursuant to section 502 of the Bankruptcy Code.  On the Effective Date, all Section 510(b) Claims shall be discharged and extinguished and the Holders thereof shall not receive or retain any property under this Plan on account of such Section 510(b) Claims.  Claims in Class 6 are Impaired.  Each Holder of an Allowed Claim in Class 6 shall be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

13

**G.    Treatment of Executory Contracts and Unexpired Leases.**

The Debtor proposes to assume substantially all of its existing executory contracts and unexpired leases as set forth in the Plan, and as listed on the Schedule attached to the Plan, subject to the terms and conditions of the Plan.

**H.    Conditions Precedent to the Occurrence of the Effective Date**

**1.    Conditions Precedent to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date: (1) The Confirmation Order shall be a Final Order, except that Debtor reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order, under circumstances that would moot such appeal; (2) No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending, including any appeal; (3) All documents necessary to implement the transactions contemplated by the Plan shall be in form and substance reasonably acceptable to the Debtor; (4) all conditions precedent to the issuance of the New Equity Interests, other than the occurrence of the Effective Date, shall have occurred; and (5) Sufficient Cash and other assets are set aside, reserved and withheld to make the distributions required by the Bankruptcy Code and the Plan.

**2.    Waiver of Conditions Precedent**

The Debtor, in its sole discretion, may waive the Final Order condition above at any time from and after the Confirmation Date.  In that event, the Debtor will be entitled to render any or all performance under the Plan prior to what otherwise would be the Effective Date if the above-referenced conditions were not waived; including, but not limited to, the right to perform under any circumstances which would moot any appeal, review or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review or other challenge.

**3.    Effect of Failure of a Condition**

If the conditions listed in sections 9.1 of this Plan are not satisfied or waived in accordance with section 9.2 of this Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date set forth by the Debtor in a notice filed with the Bankruptcy Court prior to the expiration of such period, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtor or any other Person.

**I.    Effect of Confirmation of the Plan**

**1.    Binding Effect**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

14

to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in the Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.

### 2.    Vesting of Assets

Except as otherwise provided in this Plan, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estate, including all claims, rights, and Causes of Action and any property acquired by the Debtor under or in connection with this Plan, shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests. Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may pay the charges that they incur on or after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 3.    Discharge of Claims against and Interests in Debtor

**Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise expressly provided in this Plan or in the Confirmation Order, each holder (as well as any trustee or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtor or the Reorganized Debtor.**

### 4.    Injunction against Interference with Plan

**Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.**

### 5.    Plan Injunction

**(a) Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtor and**

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

15

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are permanently enjoined after the entry of the Confirmation Order from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, the Debtor, the Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor, (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law, and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan.

(b) By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in section 10.6 of this Plan.

6.    Exculpation.

To the fullest extent permitted by applicable law, neither the Debtor nor any of its Representatives shall have or incur any liability to any Holder of a Claim or Interest against the Debtor, or any other party-in-interest, for any act, omission, transaction or other occurrence occurring on or after the Petition Date in connection with or arising out of the Chapter 11 Case, the pursuit of confirmation of the Plan, or the consummation of the Plan, including without limitation, the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; except and solely to the extent such liability is based on fraud, gross negligence, or willful misconduct as determined by a Final Order, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The exculpated parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. This exculpation is in addition to, and not in limitation of, all other releases,

**indemnities, exculpations, and any other applicable law or rules protecting such exculpated parties from liability.**

**7.    Preservation of Causes of Action.**

Pursuant to section 1123(b) of the Bankruptcy Code, the Debtor shall retain and reserve the right to enforce all rights to commence and pursue Causes of Action whether arising prior to or after the Petition Date, and whether pending as of or Filed after the Effective Date, in any court or other tribunal.  Unless a Cause of Action is expressly waived, relinquished, released, compromised or settled in the Plan, or any Final Order, the Debtor on behalf of itself expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to any Causes of Action upon Confirmation or the Effective Date.  No entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtor, will not pursue any and all available Causes of Action against them. The Debtor expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.

**V.    ALTERNATIVES TO THE DEBTOR'S PLAN**

The Debtor has determined that the Plan is the best alternative available for their successful emergence from chapter 11.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (a) the filing of an alternative chapter 11 plan of reorganization, (b) a sale of some or all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, or (c) a liquidation under chapter 7 of the Bankruptcy Code.

**A.    Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan.  Such a plan might involve either: (a) a reorganization and continuation of the Debtor's businesses or (b) an orderly liquidation of their assets.  The Debtor, however, believes that the Plan, as described herein, enables its creditors to realize the most value under the circumstances.

**B.    Sale Under Section 363 of the Bankruptcy Code**

Alternatively, if the Plan is not confirmed, the Debtor could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell all of their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Classes 1 and 2 may be entitled to credit bid on any property to which their security interests attach to the extent of the value of such security interests, and to offset their Claims against the purchase price of such property.  In addition, the security interests of the holders of Other Secured Claims would attach to the proceeds of any sale of their respective collateral to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtor does not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Allowed Claims than what they would receive under the Plan.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

17

### C.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the assets of the Debtor and distribute their proceeds to its creditors in accordance with the priorities established by the Bankruptcy Code.

As demonstrated in the Liquidation Analysis, attached hereto as **Exhibit 2**, the Debtor believes that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Case to a case under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtor's assets as required by chapter 7.

## VI.    TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

All New Equity Interests of the Reorganized Debtor issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law.  The New Equity Interests in the Reorganized Debtor will be issued in reliance upon section 1145 of the Bankruptcy Code and will be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable federal, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Equity Interests issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (ii) will be freely tradable and transferable by any holder thereof that (a) is not an "affiliate" of the Reorganized Debtor as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, (c) has not acquired the Reorganized Debtor Interests from an "affiliate" within one year of such transfer, and (d) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

18

* * * * *

Legends. Each book entry position or certificate representing the New Equity Interests issued pursuant to Section 1145 of the Bankruptcy Code to the Entities that are "underwriters" as defined in section 1145(b) of the Bankruptcy Code (collectively, the "Restricted Securities"), will bear a legend substantially in the form below:

**THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS REORGANIZED UTEX PARENT RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

The Debtor and the Reorganized Debtor, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Restricted Securities. The Debtor and the Reorganized Debtor, as applicable, also reserve the right to stop the transfer of any Restricted Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive Restricted Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any Restricted Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the Restricted Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, THE DEBTOR DOES NOT MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

## VII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain holders of Allowed Claims. This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are unimpaired or otherwise entitled to payment in full in Cash, or holders of Claims or Interests who are deemed to have accepted or rejected the Plan.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed U.S. Treasury regulations thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as broker dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation, and persons who use the accrual method of accounting and report income on an "applicable financial statement"). Additionally, this discussion does not address the Foreign Account Tax Compliance Act, the alternative minimum tax, or the "Medicare" tax on net investment income.

The discussion assumes that all Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. You are urged to consult your own tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.***

### B.    Consequences to the Debtor

With respect to the fiscal year ending on December 31, 2020, the Debtor currently projects losses of in excess of $1,000,000, which are expected to result in net operating losses

20

("NOLs")).  The Debtor expects to carry back a portion of its NOLs to offset prior year taxable income.  The amount of any NOLs and other tax attributes, as well as the application of any limitations, remain subject to review and adjustment by the IRS.

As discussed below, in connection with the implementation of the Plan, the Debtor's tax attributes (other than any carryforward of disallowed business interest) may be significantly reduced or eliminated.  In addition, the subsequent utilization of any loss and other tax attributes remaining following the Effective Date may be limited.

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes — such as current year NOLs, capital loss carryforwards, certain tax credits, and tax basis in assets — by the amount of any cancellation of debt ("COD") incurred pursuant to a confirmed chapter 11 plan.  Although not free from doubt, it is expected that carryover of disallowed business interest expense would not be a tax attribute subject to such reduction.  In applying the attribute reduction rule to the tax basis in assets, the tax law limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's post-emergence liabilities. The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Any reduction in tax attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.  Any excess COD income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact unless there is a so-called "excess loss account" ("ELA") in the stock of a debtor.  In that case, the Debtor may be required to recognize taxable income equal to the lesser of the amount of such ELA and any COD income in excess of reduced tax attributes.

The Debtor expects to incur COD as a result of the implementation of the Plan.  The amount of such COD and resulting tax attribute reduction will depend primarily on the fair market value of the New Equity Interests.  The Debtor expects that any NOLs not carried back to prior taxable years will be eliminated and that the tax basis in their assets would be reduced. Depending on the amount of COD income, it is possible that the Debtor will have COD income in excess of tax attributes required to be reduced.  The Debtor does not expect to recognize taxable income with respect to any ELA by virtue of any such excess COD income.

Under the Tax Code, any NOL carryforwards and certain other tax attributes, including carryover of disallowed interest and certain "built-in" losses, of a corporation (collectively, "Pre-Change Losses") may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the COD arising in connection with the Plan.  However, any carryforward of disallowed business interest (and possibly certain other tax attributes) would be expected to remain available notwithstanding required attribute reduction.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

21

### C.    Consequences to Noteholders

Pursuant to the Plan, in complete and final satisfaction of their respective Claims, the holders of the Allowed Noteholder Claims will receive their Pro Rata share of the New Value Contribution.  If (and to the extent) a Noteholder Claim (in whole or in part) constitutes a "security" of the Debtor, such holder will likely recognize a deductible loss to the extent the New Value Contribution does not compensate it for any amount remaining owing on its claim.  You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

*The foregoing summary has been provided for informational purposes only.  All holders of Claims are urged to consult their tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.*

## VIII.   CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A.    Certain Bankruptcy Law Considerations

#### 1.    General

Although the Debtor believes that the Chapter 11 Case will not be materially disruptive to its business, the Debtor cannot be certain that this will be the case.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtor's business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtor's relationships with their key customers.  The case will also involve additional expense and may divert some of the attention of the Debtor's management away from business operations.

#### 2.    Risk of Non-Confirmation of Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtor can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Classes entitled to vote on the Plan vote in favor of the Plan or the requirements for "cramdown" are met with respect to  any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests under a subsequent

plan of reorganization or otherwise.

### 3.   Risk of Non-Consensual Confirmation

If any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan if at least one impaired class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class. The Debtor believes that the Plan satisfies these requirements.

### 4.   Risk of Non-Occurrence of Effective Date

Although the Debtor believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtor and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims and Interests would remain unchanged.

### 5.   Conversion to Chapter 7 Case

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Case may be converted to cases under chapter 7 of the Bankruptcy Code, after which a trustee would be appointed to liquidate the Debtor's assets and distribute their proceeds in accordance with the priorities established by the Bankruptcy Code.  See the Liquidation Analysis attached hereto as Exhibit 2, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### 6.   Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtor believes that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### B.   Insufficient Cash Flow to Meet Debt Obligations

On the Effective Date, it is expected that the Reorganized Debtor will have total secured indebtedness of approximately $86,000, which is expected to consist of the Allowed Secured Claim of the SBA.  This level of expected indebtedness and the funds required to service such debt could, among other things, make it more difficult for the Reorganized Debtor to satisfy its obligations under such indebtedness, increasing the risk that they may default on such debt obligations.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

The Reorganized Debtor's earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Debtor's future cash flow may be insufficient to meet their debt obligations and commitments. Any insufficiency could negatively impact the Reorganized Debtor's business. A range of economic, competitive, business, and industry factors will affect the Reorganized Debtor's future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt. Many of these factors are beyond the Reorganized Debtor's control.

An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtor's ability to make payments on the Plan, and its business, financial condition, results of operations, and prospects.

**C.     Additional Risks Relating to Reorganized Debtor's Business and Financial Condition**

**1.     Claims Could Be More than Projected**

There can be no assurance that the estimated Allowed amount of Claims will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtor's projections, including its pro forma financial projection for the next three (3) years, which are attached as **<u>Exhibit 4</u>**, and feasibility analysis, and the variation may be material.

**2.     Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtor or Reorganized Debtor, including the timing, confirmation, and consummation of the Plan, customer demand for the Reorganized Debtor's products, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

### 3.    Risks Associated with the Debtor's Business and Industry

The risks associated with the Debtor's business and industry include, but are not limited to, the following:

      □ access to and availability of materials needed to create the Debtor's customized products;

      □ general economic conditions, whether internationally, nationally or in the regional and local market areas in which the Debtor does business, may be less favorable than expected, including the possibility that economic conditions in the United States will worsen and that capital markets are disrupted, which could adversely affect demand for the Debtor's products and make it difficult to access capital;

      □ economic, competitive, governmental, regulatory, legislative, including federal and state regulations and laws, geopolitical and technological factors that may negatively impact the Debtor's business, or operations;

      □ the Debtor's insurance coverage may not adequately cover all losses that the Debtor may sustain; and

### 4.    COVID-19 Risks

A worsening COVID-19 situation could force the Debtor to temporarily close or limit certain of its operations, which would reduce the Debtor's ability to operate its business and increase risk of liquidity constraints.  In addition, a worsening COVID-19 situation could significantly reduce demand for the Debtor's products.

### 5.    U.S. Federal Income Tax Risks

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to holders of certain Claims and Interests, see <u>Section VII</u> of this Disclosure Statement.

### D.    Factors Relating to Securities to Be Issued under the Plan

### 1.    Potential Dilution

The ownership percentage represented by the New Equity Interests distributed on the Effective Date under the Plan will be subject to dilution from exercise of the post-Effective Date Management Incentive Plan, and other securities that may be issued post-emergence.  In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtor could adversely affect the value of the New Equity Interests issuable upon such conversion.  The amount and dilutive effect of the foregoing could be material.

### 2.    Dividends

The Reorganized Debtor may not pay any dividends on the New Equity Interests.  In such

circumstances, the success of an investment in the Reorganized Debtor will depend entirely upon any future appreciation in the value of the New Equity Interests. There is, however, no guarantee that the New Equity Interests will appreciate in value or even maintain its initial implied valuation.

### 3.    Interests Subordinated to Reorganized Debtor's Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtor, the New Equity Interests will rank below all debt claims against the Reorganized Debtor. As a result, holders of the New Equity Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtor until after all the Reorganized Debtor's obligations to its debt holders have been satisfied.

### E.    Additional Factors

### 1.    Debtor Could Withdraw Plan

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor.

### 2.    Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.    No Representations Outside Disclosure Statement Are Authorized

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.    No Legal or Tax Advice Is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or holders of Claims or Interests.

26

IX.    **VOTING PROCEDURES AND REQUIREMENTS**

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote (each, a "Voting Creditor") should carefully review the Plan attached hereto as Exhibit 1.   All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

A.    **Voting Instructions and Voting Deadline**

All Voting Creditors have been sent a Ballot together with this Disclosure Statement and should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

**FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE *RECEIVED* BY THE DEBTOR'S COUNSEL AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF <u>DECEMBER 30, 2020</u> UNLESS EXTENDED BY THE DEBTOR.**

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE DEBTOR'S COUNSEL AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE DEBTOR'S COUNSEL AT:**

LARSON & ZIRZOW, LLC
Attn: Matthew C. Zirzow, Esq.
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 Telephone
(702) 382-1169 Facsimile
Email: mzirzow@lzklawnv.com

Additional copies of this Disclosure Statement are available upon request made to the Debtor's counsel, at the telephone numbers or e-mail address set forth immediately above.

B.    **Voting Procedures**

The Debtor is providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "Solicitation Package") to all record date Voting Creditors.  Voting Creditors should provide all of the information requested by the Ballot, and should complete and return all Ballots received to the Debtor's counsel either (a) electronically via e-mail to mzirzow@lzklawnv.com; (b) via regular mail to the Debtor's counsel; or (c) via facsimile to the Debtor's counsel.  A Voting Creditor may also request confirmation of receipt of its ballot from the Debtor by contacting the Debtor's counsel via email.  The Record Date for determining which Voting Creditors are entitled to vote on the Plan

27

is the date of the entry of the Disclosure Statement Order.  Such holders must submit their own Ballots.

### C.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, the holders of such Claims and Interests will not vote on the Plan and will not receive a Ballot. If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, the holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of (a) Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the Claims that cast ballots for acceptance or rejection of the Plan and (b) Interests as acceptance by interest holders in that class that hold at least two-thirds in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

☐ Class 1 Claims – SBA Secured Claims

☐ Class 4 Claims – Noteholders Claims

☐ Class 5 Claims – General Unsecured Trade Claims

A Voting Creditor should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.

### 1.    Voting Creditors

A Voting Creditor that holds a Claim as a record holder in its own name should vote on the Plan by completing and signing a Ballot and returning it directly to the Debtor's counsel such that it will be ***received*** on or before the Voting Deadline of December 30, 2020 (a) by sending

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

via e-mail to mzirzow@lzlawnv.com; (b) via regular mail to the Debtor's counsel; and (c) via facsimile to the Debtor's counsel.

### 2.      Non-Voting Parties

The Debtor will send a Notice of Non-Voting Status to the holders of Claims that are not Voting Creditors.

### 3.      Miscellaneous

All Ballots must be signed by the Voting Creditor, or any person who has obtained a properly completed Ballot proxy from the Voting Creditor, by the Voting Deadline. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. Any Ballot marked to both accept and reject the Plan shall not be counted. If you return more than one Ballot voting the same Claims differently, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted. The Debtor may attempt to contact voters to cure any such defects in the Ballots.

The Ballots provided to Voting Creditors will reflect the principal amount of such Voting Creditor's Claim; however, when tabulating votes, the Debtor may adjust the amount of such Voting Creditor's Claim to reflect the amount of the Claim actually voted, including prepetition interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Voting Creditors that actually vote will be counted.

Except as provided below, unless a Ballot is submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtor may, in its sole discretion, reject such Ballot as invalid, and therefore decline to utilize the vote(s) cast thereon in connection with seeking confirmation of the Plan.

### 4.      Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Voting Agent of authority to so act. Authorized signatories should submit a separate Ballot for each Voting Creditor for whom they are voting.

**UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED THAT THE DEBTOR RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.**

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

**5.      Agreements upon Furnishing Ballots**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the voter with respect to such Ballot to accept (a) all of the terms of, and conditions to, this solicitation; and (b) the terms of the Plan including the injunction and exculpations set forth in <u>Sections 10.3 through 10.6</u> therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

**D.      Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Debtor, as applicable, which determination will be final and binding.  The Debtor reserves the right to reject any and all Ballots submitted not in proper form or the acceptance of which would, in the opinion of the Debtor or its counsel, as applicable, be unlawful.  The Debtor further reserves its rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballots and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or within such time as the Debtor (or the Bankruptcy Court) determines.  Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**E.      Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Debtor's counsel.

**X.      CONFIRMATION OF THE PLAN**

**A.      Confirmation of the Plan.**

Pursuant to section 1128(a) of the Bankruptcy Code, the Bankruptcy Court will hold hearings regarding confirmation of the Plan at the U.S. Bankruptcy Court, 300 Las Vegas Blvd. South, Las Vegas, Nevada 89101, on **<u>January 13, 2021, at 1:30 p.m.</u>**  To the extent necessary, the Bankruptcy Court will schedule additional hearing dates, and without further notice of adjournment except as stated on the record at the hearing.

**B.      Objections to Confirmation of the Plan.**

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

confirmation of a plan.  Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for any such objections, and must be filed with the Bankruptcy Court by no later than **December 30, 2020** and served upon Debtor's counsel at the following address:

LARSON & ZIRZOW, LLC
Attn: Matthew C. Zirzow, Esq.
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 Telephone
(702) 382-1169 Facsimile
Email: mzirzow@lzlawnv.com

---

**UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN OR FINAL APPROVAL OF THE DSICLOSURE STATEMENT IS TIMELY FILED, SUCH OBJECTION MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT**

---

C.      **Requirement for Confirmation of Plan**

1.      **Requirements of Section 1129(a) of the Bankruptcy Code**

(a)      **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i) the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii) the Debtor has complied with the applicable provisions of the Bankruptcy Code;

(iii) the Plan has been proposed in good faith and not by any means forbidden by law;

(iv) any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v) the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtor has disclosed the identity of any insider who will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider;

(vi) with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code;

(vii) except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that an Allowed Administrative Claim will be paid in full on the Effective Date, and that Administrative Expense Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix) at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan; and

(xi) all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

**(b)     Best Interest of Creditors and Liquidation Analysis.**

Pursuant to section 1129(a)(7) of the Bankruptcy Code, for the Plan to be confirmed, it must provide that Creditors will receive at least as much under the Plan as they would receive in a liquidation of Debtor under chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each impaired Class requires that each Holder of an Allowed Claim of such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if Debtor liquidated under chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the value received under the Plan by the Holders of Allowed Claims in each Class of Creditors equals or exceeds the value that would be allocated to such Holders in a liquidation under chapter 7 of the Bankruptcy Code. Debtor believes that the Plan meets the Best Interest Test and provides value which is not less than that which would be recovered by each such holder in a chapter 7 bankruptcy proceeding.

Generally, to determine what Holders of Allowed Claims in each impaired Class would

receive if Debtor were liquidated, the Bankruptcy Court must determine what funds would be generated from the liquidation of Debtor's Assets and properties in the context of a chapter 7 liquidation case, which for unsecured creditors would consist of the proceeds resulting from the disposition of the Debtor's Assets, including the unencumbered Cash held by Debtor at the time of the commencement of the liquidation case.  Such Cash amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Claims and Priority Claims as may result from the termination of Debtor's business and the use of chapter 7 for the purpose of liquidation.

In a chapter 7 liquidation, Holders of Allowed Claims would receive distributions based on the liquidation of the non-exempt assets of Debtor.  Such assets would include the same assets being collected and liquidated under the Plan.  However, the net proceeds from the collection of property of the Estate available for distribution to Creditors would be reduced by any commission payable to the chapter 7 trustee and the trustee's attorney's and accounting fees, as well as the administrative costs of the chapter 11 estate (such as the compensation for chapter 11 professionals).  The Estate has already absorbed much of the cost of realizing upon Debtor's Assets.  In a chapter 7 case, the chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee to creditors, even though Debtor has already incurred some of the expenses associated with generating those funds.  Accordingly, there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by Debtor because the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed from the Estate.

It is further anticipated that a chapter 7 liquidation would result in significant delay in the payment, if any, to Creditors.  Among other things, a chapter 7 case could trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the Chapter 11 Cases to chapter 7.  Hence, a chapter 7 liquidation would not only delay distribution but raises the prospect of additional claims that were not asserted in the Chapter 11 Case.  Moreover, Claims that may arise in the chapter 7 case or result from the Chapter 11 Case would be paid in full from the Assets before the balance of the Assets would be made available to pay pre-chapter 11 Allowed Priority Claims and Allowed General Unsecured Claims.

The distributions from the Assets would be paid Pro Rata according to the amount of the aggregate Claims held by each Creditor.  Debtor believes that the most likely outcome under chapter 7 would be the application of the "absolute priority rule."  Under that rule, no junior Creditor may receive any distribution until all senior Creditors are paid in full, with interest.

As set forth in the Liquidation Analysis and accompanying notes annexed hereto as **Exhibit 2**, confirmation of the Plan will provide each Holder of a Claim in an Impaired Class with no less of a recovery than he/she/it would receive if the Debtor were liquidated under a chapter 7.  The Liquidation Analysis sets forth Debtor's best estimates as to value and recoveries in the event that the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code and Debtor's Assets are liquidated.  In a chapter 7 case, the chapter 7 trustee must liquidate the Debtor's non-exempt assets and distribute the proceeds thereof to holders of allowed claims.

As evidenced by the Liquidation Analysis and the accompanying notes annexed thereto, the value provided under the Plan to the Holders of Claims in the Impaired Classes is equal to or

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

better than they would receive under a chapter 7 liquidation.  Thus, Debtor strongly encourages all Impaired Classes to vote in favor of confirmation of the Plan.

### (c)    Feasibility.

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of Debtor (the "<u>Feasibility Test</u>").  For the Plan to meet the Feasibility Test, the Bankruptcy Court must find by a preponderance of the evidence that Debtor will possess the resources and earnings necessary to meet its obligations under the Plan.  The primary means of funding this Plan shall be the New Value Contribution, cash flow generated from operations, as well as potential future stock sales.  In support of the future, reorganized operations by the Reorganized Debtor, the Debtor has prepared a three (3) year projection of its anticipated operations, which is attached as **Exhibit 3**, which supports the Reorganized Debtor's ability to make payments under the Plan.  As a result of the foregoing, the Debtor believes it will establish and that the Bankruptcy Court will find that the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

### 2.    Additional Requirements for Non-Consensual Confirmation

Pursuant to the Plan, the holder of Interests in Class 6 (Existing Equity Interests) and Class 7 (Subordinated Securities Claims) are deemed to reject the Plan.  In addition, holders of Claims in Class 1 (SBA Secured Claim), Class 4 (Noteholder Claims), and Class 5 (General Unsecured Trade Claims) may also vote to accept or reject the Plan.  Accordingly, the Debtor will request the Bankruptcy Court to confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) requires that, with respect to each such rejecting Class, the Plan "does not discriminate unfairly" and is "fair and equitable."

### (a)    Unfair Discrimination Test

A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it is legally entitled to receive.  This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtor believes the Plan satisfies the "unfair discrimination" test.   Claims and Interests of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

### (b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtor believes that the Plan satisfies the "fair and equitable" test with respect to all rejecting Classes, as further explained below.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

34

**(i)       Secured Creditors**

The Bankruptcy Code requires that each holder of an impaired secured claim either (a) retain its liens on the property to the extent of the allowed amount of its secured claim and receive deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, or (b) have the right to credit bid the amount of its claim if its property is sold and retain its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receive the "indubitable equivalent" of its allowed secured claim.

**(ii)      Unsecured Creditors**

The Bankruptcy Code requires that either (a) each holder of an impaired unsecured claim receive or retain under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and equity interests that are junior to the claims of the dissenting class not receive any property under the plan.

**(iii)     Equity Interests**

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.

## XI.      RECOMMENDATION AND CONCLUSION

The Debtor believes the Plan is in the best interests of all stakeholders and urges the holders of Claims who are entitled to vote on the Plan vote to ***ACCEPT*** the Plan.

Dated:  November 18, 2020.

VITALIBIS, INC.,
a Nevada corporation:

By:   */s/ Steven Raack*
Its:  President and Director

Prepared and submitted:

By:   */s/ Matthew C. Zirzow*
LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

Attorneys for Debtor

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

35